IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

LADELL D. MADLOCK,

                        Plaintiff,

    v.

CODY T. SAYLOR,

                        Defendant.

OPINION and ORDER

18-cv-528-jdp

---

Pro se plaintiff Ladell D. Madlock is incarcerated at Wisconsin Secure Program Facility (WSPF). Madlock says that he told defendant Cody T. Saylor, the sergeant on his unit at WSPF, that he needed psychological help because he was feeling suicidal, but Saylor ignored him. I granted Madlock leave to proceed on a claim against Saylor under the Eighth Amendment to the United States Constitution. Dkt. 14.

Saylor moves for summary judgment. Dkt. 46. The parties dispute some of the events that preceded Madlock's overdose attempt. But even if Madlock's version of the facts is credited, no reasonable juror could conclude that Saylor consciously disregarded a serious risk to Madlock's safety. I will grant Saylor's motion for summary judgment and dismiss this case.

After briefing on Saylor's motion for summary judgment, Madlock moved for assistance in recruiting counsel. Dkt. 73. Because I am dismissing this case, I will deny Madlock's motion as moot.

FACTUAL BACKGROUND

In setting out the facts, I credit Madlock's version of any disputed fact.

In March 2018, Madlock was housed at WSPF in its Foxtrot Unit. Madlock had a history of making threats of self-harm. Psychological Services Unit (PSU) staff triage requests from inmates for psychological services. Staff respond to the most urgent requests immediately and address non-urgent requests when staff are available.

On March 30, 2018, Saylor was the correctional sergeant supervising the Foxtrot unit. Madlock's cell contained an intercom that allowed him to directly contact Saylor. Maria Lemieux was working as a psychological associate in the PSU. Madlock requested to be seen by PSU on March 30. Lemieux regarded Madlock's request as not urgent.

Madlock says that he called Saylor around 2:00 p.m., telling Saylor that he was depressed and having suicidal thoughts and that he wanted to speak to a PSU psychologist. Saylor responded, "Alright, but we're not going to deal with your suicidal bullshit cause you're not suicidal." Madlock says that he next called Saylor around 2:30, screaming that he wanted to talk to someone from PSU because he felt suicidal. Saylor responded, "Alright, I'll call PSU now, but I know you're not really suicidal." Around 3:15, Madlock says that he called Saylor a third time, asking why no one from PSU had arrived. Saylor told Madlock that he had talked to Maria Lemieux from PSU, who had been in Foxtrot to see another inmate, but Lemieux had said that she couldn't see Madlock because she had to go to another unit. In response, Madlock yelled that he really needed to talk to someone because he was really going to kill himself. Saylor responded, "Okay, whatever, you're not really going to kill yourself." (For purposes of this opinion I credit Madlock's version of these events, but Saylor denies that Madlock contacted him before 4:00 p.m. that day.)

Around 3:45, Madlock fashioned a "fishing line" by tying string from his bed to a comb, after which he slid the comb under his cell door and across the hall into another inmate's cell. The other inmate then sent about 30 pills to Madlock via the comb.

Madlock called Saylor at 4:00 p.m. and told him that he was about to take pills. Saylor immediately came to Madlock's cell, arriving at 4:02 p.m. He saw Madlock holding a cup of water and a handful of pills. He told Madlock not to take the pills, but Madlock quickly began swallowing them. Saylor then opened the trap door to Madlock's cell and sprayed him with an incapacitating agent to stop him from swallowing the pills. Saylor closed the trap and called for support staff come to the unit. Saylor left the area because he suffered the effects of the spray. Madlock says Saylor did not return; Saylor says he came back in a few minutes.

A security team arrived at Madlock's cell (Madlock says it took 25–30 minutes), removed him from the cell, and took him to a hospital, where he was treated for his overdose.

ANALYSIS

The Eighth Amendment prohibits prison officials from deliberately ignoring prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). To succeed on his Eighth Amendment claim, Madlock must prove two elements. *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006). First, he must show that he had a serious medical need. *Id.* Second, he must show that Saylor consciously ignored a substantial risk posed by this medical need. *Id.* To prove this second element, Madlock must show that Saylor knew that Madlock was at a substantial risk of imminently attempting suicide but intentionally ignored that risk. *Id.* at 760–61. But if Saylor took "reasonable preventative steps" in responding to Madlock's suicide risk, Saylor did

3

not violate Madlock's Eighth Amendment rights. *Estate of Novack ex rel. Turbin v. Cty. of Wood*, 226 F.3d 525, 529 (7th Cir. 2000).

In response to Saylor's motion for summary judgment, Madlock must present admissible evidence sufficient to convince a reasonable juror that he is entitled to relief against Saylor. *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 603 (7th Cir. 2012). I must view all evidence in the light most favorable to Madlock and draw all reasonable inferences in his favor. *Driveline Sys., LLC v. Arctic Cat, Inc.*, 936 F.3d 576, 579 (7th Cir. 2019). Even crediting Madlock's version of the events before his overdose, no reasonable jury could find that Saylor consciously disregarded Madlock's suicide risk.

**A. Saylor's response to Madlock's requests for a psychologist**

Madlock says that from 2:00 p.m. to 3:15 p.m. he called Saylor three times asking for a PSU psychologist. But even under Madlock's version of the facts, Saylor did not ignore these requests for help. According to Madlock, during the second call, Saylor said that he would call the PSU, and, during the third call, Saylor told Madlock that he had done so. Lemieux had determined that Madlock's psychological needs were not urgent. So if PSU did not come to Madlock's cell, it was because of Lemieux's judgment that Madlock's needs were not serious, not because Saylor disregarded them. And Madlock did not have the pills until he fished them from another inmate at 3:45 p.m., so he could not have made an effective threat before then.

The Eighth Amendment doesn't require a prison official to respond to a danger that he reasonably believes to be "insubstantial or nonexistent"—even if that belief is incorrect. *Farmer v. Brennan*, 511 U.S. 825, 844 (1994). Suicide is a serious safety risk. But according to Madlock, Saylor repeatedly said that he didn't believe that Madlock was suicidal. Saylor, who

is not a medical professional, was entitled to rely on Lemieux's expertise regarding Madlock's psychological needs. *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011).

**B. Saylor's response to Madlock's overdose attempt**

The parties agree that Madlock called Saylor at 4:00 p.m. with an explicit threat to take pills. The parties also agree that Saylor came to Madlock's cell within two minutes. Yet Madlock contends that Saylor failed to take reasonable steps to prevent him from overdosing.

First, Madlock contends that Saylor should have had his spray at the ready when he arrived at Madlock's cell rather than waiting to remove it from his belt once Madlock began swallowing the pills. But the use of a powerful incapacitating agent should not be a correctional officer's first choice; any reasonable officer would first try to convince an inmate to stop taking the pills. In any case, the Eighth Amendment does not require a correctional officer to choose the single most effective means of preventing harm, particularly when split-second decision-making is called for. *Giles v. Tobeck*, 895 F.3d 510, 514 (7th Cir. 2018) ("[T]he 'mere failure of the prison official to choose the best course of action does not amount to a constitutional violation.'") (quoting *Guzman v. Sheahan*, 495 F.3d 852, 858 (7th Cir. 2007)).

Second, Madlock says that Saylor should not have left his cell door after spraying him because he was able to swallow the remaining pills before the security team arrived. But if a blast of pepper spray didn't stop Madlock, what else could Saylor have done to prevent him from taking the rest of the pills? Saylor took a reasonable course of action: he called a security team, who removed Madlock from his cell and took him to the hospital for treatment. Again, the Eighth Amendment does not require a correctional officer to take the most effective action. *Id.* In this case, it's not clear that Saylor could have done anything more.

ORDER

IT IS ORDERED that:

1. Defendant Cody T. Saylor's motion for summary judgment, Dkt. 46, is GRANTED. The clerk of court is directed to enter judgment in favor of defendant and close this case.

2. Plaintiff Ladell D. Madlock's motion for assistance in recruiting counsel, Dkt. 73, is DENIED as moot.

Entered March 9, 2020.

                              BY THE COURT:

                              /s/

                              _____
                              JAMES D. PETERSON
                              District Judge